

2015 JUL 13 AM 11: 32

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 70704-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| DAMIAN MACINTOSH WILHELM, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 13, 2015 |
| | ) | |

LAU, J. — Damian Wilhelm appeals his jury trial conviction for a felony violation of a no-contact order and fourth degree assault involving his girlfriend, Leah Hensel. He challenges the trial court's ER 404(b) admission of his 2011 domestic violence conviction against Hensel, denial of his motion to bifurcate the jury trial, and prosecutorial misconduct in closing argument. Finding no error, we affirm his judgment and sentence.

<u>FACTS[1]</u>

The trial evidence shows the following facts: Damian Wilhelm and Leah Hensel started dating in 2011. On the evening of March 10, 2013, Wilhelm and Hensel met Hensel's best friend, Heather Wilmore, for drinks at their Bellevue condominium. They

---

[1] Wilhelm was convicted four times of domestic violence against Hensel.

joined a friend, Damian Keitt, at an Auburn bar and continued to drink.[2] On the way back to the condominium, they decided to stop at a QFC for food and cigarettes. Wilhelm and Hensel went into the store around 3:00 a.m. while Wilmore and Keitt waited in the car. About 30 to 40 minutes later, they went inside to look for Wilhelm and Hensel.

### Heather Wilmore

Wilmore testified that after using the QFC restroom, she heard Wilhelm yelling angrily at Hensel, calling her "a slut and dirt and a whore and a hoe." Report of Proceedings (RP) (July 11, 2013) at 80. She heard Hensel crying and asking Wilhelm to "stop." RP (July 11, 2013) at 79-80. Wilmore saw Hensel seated or kneeling on the floor as Wilhelm threw boxes of food and cans at her from the store shelf. Wilmore saw some of the items strike Hensel and Hensel's injured forehead. Wilmore "tried to stop him" and injured her hand from a box or a can thrown by Wilhelm. RP (July 11, 2013) at 81. Wilmore said Keitt "stopped him" when he "grabbed [Wilhelm's] arms from behind him."[3] RP (July 11, 2013) at 83. "He was just stopping [Wilhelm] from throwing things." RP (July 11, 2013) at 83. The QFC surveillance video shows that the struggle moved to the front of the store near the cash registers where it eventually stopped. The video shows Wilhelm leaving the store. As the video was played, Wilmore described what took place "beyond the camera shot" that could not be seen in the video. RP (July 11,

---

[2] This last name is taken from the certificate of probable cause in the record. At trial, neither Wilhelm nor the other witnesses knew Keitt's last name so he was referred to as the "other Damian" to avoid confusion with the defendant, Damian Wilhelm.

[3] Keitt did not testify at trial, but the store video recorded portions of the struggle between Keitt and Wilhelm.

2013) at 92. Wilmore acknowledged her poor memory and intoxication but testified the assault stuck out in her mind because she was "not normally around stuff like that." RP (July 11, 2013) at 88. She also agreed that she could not say where the injury on Hensel's forehead came from. RP (July 11, 2013) at 108. She maintained that she saw Wilhelm "throwing things" at Hensel "in the middle of the store." RP (July 11, 2013) at 110.

Gary Morrison

QFC store clerk Gary Morrison testified that Wilhelm came into the store sometime after 2:00 a.m. and asked for the alcohol aisle. Morrison said Wilhelm was drunk. After Wilhelm walked away, Morrison heard "some arguing and screaming" in aisle 13. RP (July 11, 2013) at 11-12, 15. He walked to aisle 13 and saw Wilhelm yelling at Hensel. She was on her knees with her head down and crying:

> [STATE]: The girl that he was yelling at, was she—which side of the defendant was she on, from your vantage point?
> [MORRISON]: He was between me and her, so she was further down—on her knees.
>    [STATE]: What was he yelling at her?
>    [MORRISON]: He was calling her dirt and just yelling at her.
> [STATE]: What was she doing? What were you able to see of what she was doing?
> [MORRISON]: It looked like she just had her head down and was kind of crying, wasn't really saying much.
>    [STATE]: Okay. What was he[r] position on the ground?
>    [MORRISON]: On her knees.

RP (July 11, 2013) at 13-14.

Morrison said during the "arguing and screaming" the "other couple [Keitt and Wilmore] came over [to aisle 13] and the arguing got louder." RP (July 11, 2013) at 14-15. The store video shows them running over to aisle 13 from an adjacent aisle.

Morrison turned to walk back to the front of the store but returned to the aisle when he heard arguing, screaming, and crashing sounds. He saw Keitt "behind the defendant . . . with his arms around his neck area. . . . [T]rying to subdue [Wilhelm], pull him down. . . . [To] keep [Wilhelm] from fighting. . . . He did hold [Wilhelm] down a little—for a little while." RP (July 11, 2013) at 17. He saw Keitt wrestling with Wilhelm:

> [STATE]: Okay. And once you came back to the aisle, aisle 13, what did you see?
> [MORRISON]: I saw [Keitt] and him and the—Wilhelm fighting.
> [STATE]: Okay. How did they—what were they doing in terms of fighting? How were they fighting? Who was doing what? If you could just take me step by step.
> [MORRISON]: Well, [Keitt] kind of grabbed [Wilhelm], was mostly just trying to wrestle. They were wrestling mostly. They were—weren't throwing [p]unches but just mostly wrestling.

RP (July 11, 2013) at 16.

Morrison heard Keitt[4] yelling at Wilhelm "that he shouldn't hit a girl." RP (July 11, 2013) at 19.

He also testified that while watching the struggle, both Wilmore and Hensel were shouting out to call the police. After Morrison pulled Wilhelm and Keitt apart, Wilhelm walked out of the store. Morrison said he saw "[a] cut on [Hensel's] forehead." RP (July 20, 2013) at 20. He also said "[Wilhelm] was yelling at this girl [Hensel] . . . just really didn't make that much sense. He was just kind of just yelling and just kind of seemed out of control." RP (July 11, 2013) at 23.

Morrison cleaned and picked up items from the floor of aisle 13. He said the struggle between Wilhelm and Keitt caused food items from the shelf to fall to the floor.

---

[4] Morrison's trial testimony referred to Keitt as the "black male."

He said after the fight broke up, Wilmore "was trying to talk her friend into pressing charges on [Wilhelm]." RP (July 11, 2013) at 21. The State played the store video as Morrison described the actions of Wilhelm, Hensel, Wilmore, Keitt and himself depicted in the video. Morrison said Wilmore and Hensel remained at the store talking to police officers. In response to the prosecutor's question about Hensel's emotional state, Morrison said she was, "[j]ust real anxious and wondering what she should do. . . . Her eyes were just red from just crying and stuff and she just looked like she was—been crying a lot." RP (July 11, 2013) at 21.

### Officer Dustin Huberdeau

Police officers arrived approximately seven minutes after the 911 call. Issaquah Police Officer Dustin Huberdeau contacted Hensel as she walked through the QFC parking lot. A store employee pointed Hensel out to Officer Huberdeau, "indicating that she was involved somehow in this fight." RP (July 11, 2013) at 162. Officer Huberdeau said he asked Hensel "to come over to me" and she complied. RP (July 11, 2013) at 162. She told Officer Huberdeau "that she was 'drunk.'" RP (July 11, 2013) at 162.

He saw a bloody cut on her hairline and a broken fingernail. This indicated to him that Hensel "was involved in some type of struggle with breaking a fingernail as well as the cut to her head." RP (July 11, 2013) at 165. He noted that she appeared intoxicated, unstable on her feet, and held a man's wallet in her hand. She "indicated [the wallet] wasn't hers." RP (July 11, 2013) at 163. When he requested Wilhelm's identification, she handed it to him but refused to give Officer Huberdeau Wilhelm's wallet. He asked her how she got the injury. Hensel told Officer Huberdeau that Wilmore injured her in a fight. Officer Huberdeau asked her again how she got injured

-5-

and she said that "she fell down." RP (July 11, 2013) at 183. She also said she did not know about the forehead injury until he pointed it out to her. When the prosecutor asked Officer Huberdeau "what could you tell about her? What could you see about her?" RP (July 11, 2013) at 168. He described what he observed:

> She was very—I mean, with most intoxicated people, you're very up and down emotionally. You know, she was very calm, thought things were funny at one point and then she became very serious and shut down. And then she would be, again, you know, more light—lighthearted essentially, telling me stuff and then brought it back to, you know, doesn't want to say anything.

RP (July 11, 2013) at 168.

Hensel told Officer Huberdeau that she was not supposed to be with Wilhelm. She refused to cooperate and declined to give Officer Huberdeau a statement about what happened. She said she did not want to cause trouble for Wilhelm.

> [STATE]: Officer Huberdeau, did Ms. Hensel tell you why she did not want to tell you—or talk to you or give you a statement?
> [OFFICER HUBERDEAU]: She indicated she didn't want to get her boyfriend in trouble because she knew he wasn't supposed to be with her.

RP (July 11, 2013) at 182.

Officer Huberdeau testified that after Miranda warnings, Wilhelm denied being present at the QFC and denied he knew Hensel. Wilhelm later admitted he knew Hensel but denied that they were dating.

### Officer Scott Geiszler

Issaquah Police Officer Scott Geiszler testified that when he arrived, Hensel was walking around outside calling out Wilhelm's name. She was "visibly upset," "crying," and "hysterical." RP (July 15, 2013) at 13. Officer Geiszler said she appeared intoxicated. He said Hensel was "not very cooperative" with police about what

happened. RP (July 15, 2013) at 14, 16. Officer Geiszler told her that "it wasn't okay for her to be beaten, for her to be assaulted." RP (July 15, 2013) at 16. Officer Geiszler tried to persuade Hensel to give him a statement about what happened. He told her about "[domestic violence] programs out there to help her with the situation." RP (July 15, 2013) at 16. Hensel responded by telling Officer Geiszler that she loved Wilhelm and did not want to get him in trouble. She did not deny or correct Officer Geiszler's comment about her being beaten or assaulted. She let Officer Geiszler photograph her injury but refused to allow him to photograph her face and refused to give him a statement. The court admitted two photographs depicting Hensel's injury. The photographs show a fresh injury on Hensel's forehead at her hairline.

On cross-examination, Officer Geiszler testified about the statement he took over the telephone from Wilmore. She told him she witnessed "things being thrown at Ms. Hensel. . . . [S]he stated it may have been . . . a box or [canned] food." RP (July 15, 2013) at 23. Officer Geiszler also explained that after talking to Keitt and Wilmore about a report of "two males in a fight," he learned about an "assault between a man and a woman." RP (July 15, 2013) at 25.

Police Sergeant Jeffrey Johnson

Issaquah Police Sergeant Jeffrey Johnson saw Hensel walking around the parking lot calling out Damian's (Wilhelm) name. He talked to Wilmore in the store and noticed that she had been drinking. He said Wilmore "was upset," "shaking," and her voice was "shaky." RP (July 15, 2013) at 34. Wilmore told Sergeant Johnson that "she had walked into the store to find her friend, Ms. Hensel, and found her friend, [Hensel] was on the floor being hit in the head by her boyfriend with a can of goods from the

-7-

store." RP (July 15, 2013) at 35. Sergeant Johnson noticed "a small cut . . . on [Wilmore's] hand." RP (July 15, 2013) at 35.

Sergeant Johnson located Wilhelm walking on a road not far from the QFC. Sergeant Johnson ordered Wilhelm twice to stop. Wilhelm "took off running . . . [a] full sprint" through a heavily vegetated area down a steep embankment towards a culvert that drains water out towards a lake. RP (July 15, 2013) at 40. Officers found Wilhelm "down in the creek underneath the overhang of the grass . . . tucked in towards the culvert . . . laying on his stomach." RP (July 15, 2015) at 43. After repeated officer commands to "[s]how us your hands" and "[c]ome out," he finally got up and surrendered to the officers who arrested him. RP (July 15, 2013) at 43. According to the officers, Wilhelm "smelled pretty strong of intoxicants." RP (July 15, 2013) at 44.

### Detective Brian Horn

Detective Brian Horn testified about certified court records, exhibits 14, 15, 16, and 17, admitted at trial establishing the existence of two prior domestic violence no-contact orders and Wilhelm's two prior domestic violence no-contact order convictions all involving Hensel.

### Leah Hensel

At trial, Hensel testified in response to the prosecutor's question "[w]hat do you want to have happen in this case?" RP (July 11, 2013) at 119. She said she wanted Wilhelm "to get in as less trouble as possible" and for him to "get better." RP (July 11, 2013) at 120. She responded to details about what happened before going to QFC. She remembered going inside QFC with Wilhelm to buy food and cigarettes. When questioned about the assault, she claimed no memory of what happened because she

-8-

"blacked out" (presumably due to intoxication). Her memory returned when Wilhelm ran out of the store when "Heather said the police were coming." RP (July 11, 2013) at 125. She remembered talking to police officers and refusing to cooperate because she "didn't want to get [Wilhelm] in trouble [for] being with me." RP (July 11, 2013) at 126. She testified that Wilhelm knew "we had a no contact order." RP (July 11, 2013) at 126. She "felt horrible" when police arrested Wilhelm. RP (July 11, 2013) at 126. She remembered the cut to her forehead but "[didn't] know what it was from." RP (July 11, 2013) at 127. She remembered the police photographed the injury. She read to the jury her written victim impact statement. In it she wrote, "I want him to not be in jail for this . . . I love him and he doesn't deserve this. . . . There's nothing wrong with [our] relationship." RP (July 11, 2013) at 131-33. She was shown the store video but denied it revived her memory about the assault. She acknowledged that Wilhelm previously assaulted her in September 2011, she had forgiven him, and they got back together. She also acknowledged that she has "forgive[n] him now for what happened here." RP (July 11, 2013) at 139. Finally, she said she could not imagine life without him.

On cross-examination, she said about the 2011 assault conviction, her memory of it was unclear due to alcohol consumption. She refused to cooperate with the police investigation, and she "didn't want him to get in trouble." RP (July 11, 2013) at 141-42. She said she did not recall how she got the cut on her forehead. Defense counsel suggested to her "it [could have] been caused by yourself or by anything that night. . . . So it could have come from you stumbling or falling, correct[?]" RP (July 11, 2013) at 145-46. She answered, "It could have, yeah." RP (July 11, 2013) at 146. She acknowledged that testifying in the case would not stop her from being with Wilhelm.

On redirect, the prosecutor asked her to confirm that she never told police officers, "I don't remember what happened. That's not what you told them, correct?" Hensel answered, "[c]orrect. . . . I'm pretty sure they just asked me for a statement and I refused." RP (July 11, 2013) at 150.

Wilhelm did not testify or present evidence at trial.

The State charged Wilhelm with one count of felony violation of a no-contact order and third degree assault.[5] The court gave the jury two written limiting instructions. Jury instruction 4 instructed the jury that it may consider the fact of Wilhelm's 2011 assault conviction against Hensel only for the limited purpose of "assessing the credibility of Leah Hensel and explaining the inconsistencies in her testimony." Clerk's Papers (CP) at 38.

Jury instruction 5 limited the purpose of Wilhelm's two prior no-contact order convictions to determining an essential element of the felony no-contact order violation charge.

> Evidence has been introduced in this case on the subject of two prior convictions for violating the provisions of an order for the limited purpose of proving the element: subsection (4)(b) of the Violation of a No Contact Order Jury Instruction. You must not consider this evidence for the purpose of determining whether the order was violated in this case. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this instruction.

(CP) at 39.

The jury found Wilhelm guilty of felony violation of a court order and the lesser degree offense of fourth degree assault. On a special verdict form, the jury found that

---

[5] For the felony violation of a no-contact order charge, the State alleged the alternative means of an assault or two prior convictions for violating a court order.

Wilhelm and Hensel were members of the same family or household at the time the crimes were committed.

Wilhelm appeals.

ANALYSIS

Admissibility of ER 404(b) Evidence

Wilhelm challenges the trial court's ruling admitting his 2011 assault conviction of Hensel for impeachment purposes. He argues the prior assault "did not assist in any credibility determination and did not explain any 'inconsistency' in [Hensel's] testimony. Hensel simply did not remember what happened inside the store." Appellant's Br. at 14.

Before trial, the State moved under ER 404(b) to introduce Wilhelm's 2011 and 2012 assault convictions involving Hensel. It argued that the convictions "encompasses what Baker was addressing . . . inconsistency of victim's statements." RP (July 9, 2013) at 49. It also argued the prior convictions would allow the jury to better assess Hensel's credibility and understand the context of their relationship. The State made an offer of proof as to Hensel's expected trial testimony:

> Ms. Hensel . . . is expected to not at this point to fully recant, but she has given several different statements since the time this happened. At the scene [Hensel] first said, "I fell down, that's how I got this injury," and then she said "Actually, my friend Heather," the other witness there, She—"she pushed me and she fought with me. She hurt me." And then she talked to the officer . . . about how much she cared about the defendant, how she didn't want to get him into trouble, that she knew there was a no-contact order. . . But she was displaying . . . a woman who was in clear conflict.

RP (July 9, 2013) at 49-50.

Defense counsel argued to the trial court that Hensel's expected trial testimony will consist of her saying she doesn't remember what happened, therefore, there is no

-11-

inconsistent testimony to impeach. He also argued the relevance of the two prior

assaults is outweighed by the prejudice to Wilhelm.

The trial court conditionally admitted the 2011 assault conviction but only if

Hensel's trial testimony was inconsistent with her prior out of court statements.[6]

> I'm assuming about [the State's] statements on the night in question about [the State's] proffer of what her statements are, that she will testify to conflicting versions of events.
>     If, in fact, she does not, if she testifies in accord with her statements to police on the night in question, the court ruling does—the state is not permitted to use the 404(b). So if she comes to court and says exactly what she told police on the night in question and she doesn't testify in conflict with it, then there's no conflicting testimony.
>     But in the event, as stated by counsel, that there is a conflict in the testimony, then the court has to analyze whether there's a 404(b) purpose for which the evidence is sought to be introduced. The purpose appears to be to prove the assault three that is alleged, which is a legitimate purpose and appears to be relevant.
>     The real issue is whether the probative value outweighs the prejudicial effect. It is clear under [Magers] that if we have a recanting victim, this type of evidence is admissible for determining credibility. In Baker, [162 Wn. App. 468, 259 P.3d 270 (2011)] the court opened that up further to explain prior failures to report, minimization of violence, conflict in history, violations of prior court orders or committed contact. Those issues are applicable in this case. The probative value is high. The prejudicial effect obviously is high as well.

RP (July 9, 2013) at 61-62 (emphasis added).

The court's written findings of fact and conclusions of law reflect its oral ruling:

> 2. The Court makes a finding that the probative value of the following incidents is not outweighed by the danger of unfair prejudice or confusion of the issues. The Court has relied on the following cases in assessing whether the State's evidence should be admitted at trial: State v. Grant, State v. Baker, and State v. Magers. [83 Wn. App. 98, 920 P.2d 609 (1996); 162 Wn. App. 468, 259 P.3d 270 (2011); 164 Wn.2d 174, 189 P.3d 126 (2008)]. While the facts themselves are not favorable to the

---

[6] The court excluded the 2012 assault conviction because the facts of that assault were too similar to the facts in the present case.

defendant, the evidence is highly probative for specific purposes and there is no other, less prejudicial means of admitting the same information.

3. The Court admits evidence of the defendant's September 2011 conviction of Assault 4th Degree—DV against Leah Hensel, predicated on Ms. Hensel actually testifying to conflicting versions of the events. The evidence of the September 2011 assault serves to elucidate Ms. Hensel's state of mind, which is relevant for the purpose of assessing her credibility, which will be a central issue during the State's case in chief. The jury is entitled to assess evidence of the victim's credibility with full knowledge of the dynamics of a relationship marked by domestic violence. Particularly in this case, the jury will need to assess Ms. Hensel's behavior, including why she did not report the assault to the police herself, why she invited contact with the defendant despite the no contact orders, and why she was reluctant to cooperate with police or the prosecution. In light of Ms. Hensel's inconsistent acts, the defendant's prior bad acts help explain the context of the relationship, her minimization/denial of the incident, and her state of mind and credibility.

CP at 77 (emphasis added).

<u>Waiver</u>

We first determine whether Wilhelm's challenge to the admission of the 2011 assault conviction is properly before us. Where evidentiary rulings are made based on a motion in limine, the losing party has a standing objection if the judge made a final ruling, unless the trial court indicates that further objections will be required at trial. State v. Powell, 126 Wn.2d 244, 256, 893 P.2d 615 (1995). When a ruling on a motion in limine is tentative, however, "any error in admitting or excluding evidence is waived, unless the trial court is given an opportunity to reconsider its ruling." Powell, 126 Wn.2d at 256 (quoting State v. Carlson, 61 Wn. App. 865, 875, 812 P.2d 536 (1991)). The Supreme Court further explained:

"If the trial court has made a definite, final ruling, on the record, the parties should be entitled to rely on that ruling without again raising objections during trial. When the trial court refuses to rule, or makes only a tentative

ruling subject to evidence developed at trial, the parties are under a duty
to raise the issue at the appropriate time with proper objections at trial."

Powell, 126 Wn.2d at 256 (quoting State v. Koloske, 100 Wn.2d 889, 896, 676 P.2d 456

(1984) (emphasis added) overruled on other grounds by State v. Brown, 111 Wn.2d

124, 761 P.2d 588 (1988)).

Here, the trial court's ruling was predicated on Hensel testifying inconsistently:

The Court admits evidence of the defendant's September 2011 conviction
of Assault 4th Degree—DV against Leah Hensel, predicated on Ms.
Hensel actually testifying to conflicting versions of the events.

CP at 77 (emphasis added).

Quoted above, both the court's oral and written ruling made clear that admission

of the ER 404(b) evidence was not final and predicated on whether Hensel's trial

testimony was inconsistent with her prior out of court statements. Defense counsel

never re-raised the prior assault evidence issue again at trial or objected to its

admission when the State first questioned Hensel about the 2011 assault conviction at

trial. After sustaining a defense objection as to only the form of the question, the State

asked Hensel about Wilhelm's 2011 assault conviction. Wilhelm did not object despite

an opportunity to do so.

[STATE]: Isn't it true that you actually do remember what happened that
night but you simply [don't] want to get him in any trouble?
[HENSEL]: No.
    [DEFENSE COUNSEL]: Objection, argumentative, Your Honor.
    [THE COURT]: Sustained. The court will strike the question and
answer.
    [STATE]: Your Honor, this is going to go into our pretrial. Do I
lead?
    THE COURT: Go ahead.
[STATE]: Ms. Hensel, Mr. Wilhelm was convicted of assaulting you in
September of 2011, wasn't he?
    [HENSEL]: Yes.

RP (July 11, 2013) at 138-39.

We conclude that Wilhelm's failure to object to the trial court's tentative pretrial ruling on the admission of the 2011 assault conviction at trial constitutes waiver of that issue on appeal.

### ER 404(b)

But even if we assume Wilhelm properly preserved this issue for review, the trial court properly admitted his 2011 assault conviction for a nonpropensity purpose.

We "review the trial court's interpretation of ER 404(b) de novo as a matter of law." State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). The trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds, such as the misconstruction of a rule. State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997).

ER 404(b) is a categorical bar to the admission of evidence of prior bad acts for the purpose of proving a person's character and showing that the person acted in conformity with the character.[7] State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). But the same evidence may be admissible for another purpose, depending on

---

[7] ER 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

its relevance and the balancing of its probative value and danger of unfair prejudice. Gresham, 173 Wn.2d at 420.

Before admitting evidence of past crimes, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is offered, (3) determine if the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against its prejudicial effect. In re Det. of Coe, 175 Wn.2d 482, 493, 286 P.3d 29 (2012). It is undisputed that the trial court's oral and written findings support its ruling.

Wilhelm specifically argues that Hensel's lack of memory trial testimony is not inconsistent with her out of court statements. We disagree. Viewed in the context of all the evidence presented at trial and her own out of court statements, Hensel's lack of memory claim at trial directly conflicted with her out of court statements. By the end of the trial even defense counsel acknowledged Hensel's inconsistent statements.[8] Defense counsel told the jury, "we all know that [Hensel] is somewhat not a credible witness. I mean, the [S]tate impeached her with prior inconsistent testimony. . . . [U]se that assault to assess her credibility, . . . . [S]he's not a very credible witness . . . [b]ut just because she's not credible doesn't mean an assault happened." RP (July 15, 2013) at 131.

---

[8] Arguably defense counsel's tactical decision not to object at trial to the assault conviction's admission supported the ER 404(b) limiting instruction he proposed and challenges on appeal. That instruction told the jury to use the conviction only to assess Hensel's "credibility" and "inconsistencies." CP at 38. As Wilhelm's closing remarks show, from that limiting instruction he argued Hensel's questionable credibility and her inconsistent statements.

-16-

The State relied on State v. Grant, 83 Wn. App. 98, 920 P.2d 609 (1996), State v. Magers, 164 Wn.2d 174, 189 P.3d 126 (2008), and State v. Baker, 162 Wn. App. 468, 259 P.3d 270 (2011). In Grant, the victim initially refused to identify her husband as the attacker but later did so when removed from his presence. Grant, 83 Wn. App. at 101-02. This court held that prior assaults by a husband against his wife were admissible to explain the wife's "inconsistent statements and conduct" and why she minimized the violence. Grant, 83 Wn. App. at 109. The State introduced the prior assaults at trial through the victim's therapist. We reasoned, "The jury was entitled to evaluate her credibility with full knowledge of the dynamics of a relationship marked by domestic violence and the effect such a relationship has on the victim." Grant, 83 Wn. App. at 108.[9]

Our Supreme Court cited Grant with approval in State v. Magers. There, the victim appeared frightened and initially denied that the defendant was in her home. When police asked her to step outside, she admitted the defendant was inside and stated he was violent, going to hurt her, and asked police not to tell him she said he was inside. Magers, 164 Wn.2d at 178-79. The victim later recanted in two letters to the prosecutor and repeated this recantation at trial. Magers, 164 Wn.2d at 179-80. The court concluded that, "prior acts of domestic violence, involving the defendant and the

---

[9] Division Two of this court agreed with the Grant court's conclusion that prior incidents of domestic violence can be admissible to "assess the state of mind of an individual whose acts are inconsistent with a report of abuse." State v. Cook, 131 Wn. App. 845, 852, 129 P.3d 834 (2006). But the court rejected the notion that such evidence should be admissible as probative of the victim's credibility. Cook, 131 Wn. App. at 851.

crime victim, are admissible in order to assist the jury in judging the credibility of a recanting victim." Magers, 164 Wn.2d at 186.

In Baker, the court held that evidence of two prior assaults by the defendant against his girlfriend were relevant to show the defendant's motive, prove lack of accident or mistake, and to aid the jury's assessment of the girlfriend's credibility. Baker, 162 Wn. App. at 474-75. In so deciding, the court stated that the holdings in Grant and Magers were not limited to instances where the victim recanted.

In State v. Gunderson, 181 Wn.2d 916, 337 P.3d 1090 (2014),[10,11] the State charged Gunderson with one count of domestic violence felony violation of a court order for an alleged assault of his girlfriend, Christina Moore. She provided no statements about the incident. At trial, Moore denied any assault by Gunderson. The State tried to impeach Moore by introducing Gunderson's prior domestic violence against her. Gunderson objected on ER 404(b) grounds but the trial court admitted the evidence. Bonnie, Moore's mother, denied she saw Gunderson assault Moore and claimed faulty memory. She also said Gunderson was "[p]robably defending himself." Gunderson, 181 Wn.2d at 920. The State introduced Bonnie's 911 call. The call indicated she was panicked and repeated Gunderson hit Moore. Bonnie's police statement, read to the

---

[10] The Washington Supreme Court issued its opinion in State v. Gunderson after the parties completed their briefing. We ordered the parties to submit supplemental briefing on the effect, if any, of Gunderson on the present case.

[11] After oral argument Wilhelm submitted a Statement of Additional Authorities. The filing included a copy of the State's motion for reconsideration in Gunderson. In its motion, the State asked the court to modify its original opinion to clarify that a victim's inconsistent acts could also be a basis for admitting prior assaults involving the defendant and the victim. The court denied the motion on January 13, 2015.

Wilhelm's submission of the State's reconsideration motion is unhelpful. The Supreme Court denied the motion without providing a rationale.

jury, said Gunderson hit Moore and he kicked and hit her also. The jury convicted Gunderson as charged.

The Supreme Court explained that in Magers, "we took great care to specifically establish that 'evidence that [the defendant] had been arrested for domestic violence and fighting and that a no-contact order had been entered following his arrest was relevant to enable the jury to assess the credibility of a [complaining witness] who gave conflicting statements about [the defendant's] conduct.'" Gunderson, 181 Wn.2d at 923-24 (alteration in original) (quoting Magers, 164 Wn.2d at 186). The State conceded on appeal that Moore's testimony was "internally consistent." Gunderson, 181 Wn.2d at 924. Nonetheless the State maintained that the ER 404(b) evidence was proper because "other evidence contradicted [Moore's] account." Gunderson, 181 Wn.2d at 924. In rejecting this approach, the court reasoned that "evidence from a different source" alone, does not establish the relevance of domestic violence history. Gunderson, 181 Wn.2d at 924. That Moore "gave no conflicting statements about Gunderson's conduct" was a significant factor in the court's rejection of the State's reliance on other inconsistent evidence: "We decline to extend Magers to apply in such circumstances." Gunderson, 181 Wn.2d at 924. The court reasoned, "the mere fact that a witness has been the victim of domestic violence does not relieve the State of the burden of establishing why or how the witness's testimony is unreliable." Gunderson, 181 Wn.2d at 924-25. Accordingly, the court held:[12]

---

[12] In Gunderson, the court made it manifestly clear that its opinion should not be read to mean that only instances of the victim's recantation or inconsistent account satisfies the stringent ER 404(b) probative versus prejudice analysis:

> To guard against this heightened prejudicial effect, we confine the admissibility of prior acts of domestic violence to cases where the State has established their overriding probative value, <u>such as to explain a witness's otherwise inexplicable recanting or conflicting account of events.</u> Otherwise, the jury may well put too great a weight on past conviction and use the evidence for an improper purpose. Accordingly, <u>we decline to extend Magers to cases where there is no evidence of injuries to the alleged victim and the witness neither recants nor contradicts prior statements.</u>

Gunderson, 181 Wn.2d at 925 (emphasis added) (citations omitted)[13]

Wilhelm contends that Hensel's testimony about not remembering what happened the night of the assault cannot be considered the type of "conflict" described in Magers. According to Wilhelm, Hensel did not change her story, recant, or state that she feared reprisals for testifying. She just forgot what happened. Thus, Wilhelm

---

> This opinion should not be read as confining the requisite overriding probative value exclusively to instances involving a recantation or an inconsistent account by a witness. We are inclined to agree with the dissent that it may be helpful to explain the dynamics of domestic violence when offered in conjunction with expert testimony to assist the jury in evaluating such evidence. See, e.g., Grant, 83 Wn. App. at 108. We decline, however, to establish an advisory list of possible scenarios.

Gunderson, 181 Wn.2d at 925 n.4.

[13] In a footnote, the Gunderson court addressed Baker and Grant. It observed that Grant concluded that the defendant's prior bad acts were admissible to explain inconsistencies in the victim's testimony and why the victim permitted the defendant to see her despite the no-contact order. But it stated, "Perhaps most importantly, '[t]he State sought to admit evidence of these dynamics through testimony of [the victim]'s therapist.'" Gunderson, 181 Wn.2d at 924 n.2 (alteration in original) (quoting Grant, 83 Wn. App. at 108).

In regards to Baker, the court wrote:

> While Baker in passing suggests prior acts of domestic violence might always be admissible, the evidence in that case was clearly admissible to explain why the victim did not report prior times the defendant attempted to strangle her and to rebut the defendant's theory that the strangulation was accidental.

Gunderson, 181 Wn.2d at 924 n.2.

argues his case is materially indistinguishable from <u>Gunderson</u> and the ER 404(b)

evidence should be excluded and his conviction reversed.

We disagree. Contrary to Wilhelm's claim, a trial court retains discretion to

determine inconsistency based on the entire impression or effect of a witness's

testimony:

> "Inconsistency is to be determined, not by individual words or phrases
> alone, but <u>by the whole impression or effect</u> of what has been said or
> done. On a comparison of the two utterances are they in effect
> inconsistent? Do the two expressions appear to have been produced by
> inconsistent beliefs?"

<u>State v. Dickensen</u>, 48 Wn. App. 457, 467, 740 P.2d 312 (1987) (quoting 5 K. TEGLAND,

WASHINGTON PRACTICE: EVIDENCE § 256 (2d ed. 1982)).

Indeed, "'[I]f the witness testifies at trial about an <u>event</u> but claims to have no

knowledge of a material detail, or no recollection of it, most courts permit a prior

statement indicating knowledge of the detail to be used for impeachment.'" <u>State v.</u>

<u>Newbern</u>, 95 Wn. App. 277, 292, 975 P.2d 1142 (1999) (quoting 5A KARL B. TEGLAND,

WASHINGTON PRACTICE: EVIDENCE § 256, at 309 (3d ed. 1989)). It is true that if a witness

gives <u>no</u> substantive testimony because of a lack of memory, a prior statement is

inadmissible regardless of whether the lapse of memory is genuine because there is no

testimony to impeach.[14] <u>Newbern</u>, 95 Wn. App. at 292 (citing 5A TEGLAND, §256, at

310).

---

[14] This is the evidentiary concern addressed in <u>Gunderson</u>. 181 Wn.2d at 925 n.3. In other words, there is nothing to impeach if the witness makes no statement at all about the incident.

This case is unlike the facts in Gunderson. There, the victim suffered no injury and provided no statements. In this case, Hensel sustained a visible forehead injury and made statements to police officers that are inconsistent with her trial testimony. At trial, Hensel's claim she was "drunk" and "blacked out" (which accounts for why she could not recall the assault), is inconsistent with her statement to the officers. Instead of telling them she could not remember what happened because she was "drunk" and "blacked out," she told them two conflicting versions of what happened—her friend injured her and she fell down on her own. Both versions are inconsistent with Hensel's "I don't remember what happened" trial testimony.[15] She made several other statements to officers, summarized above, that are inconsistent with her loss of memory at trial. Hensel also undermined her own trial testimony when she acknowledged on cross-examination that the forehead cut could have occurred from falling or stumbling even though she said she could not remember what happened. Courts have discretion in determining whether a claimed failure of memory is genuine. See e.g. United States v. Rogers, 549 F.2d 490, 496 (8th Cir. 1999) ("A claimed inability to recall, when disbelieved by the trial judge, may be viewed as inconsistent with previous statements when the witness does not deny that the previous statements were in fact made"). We conclude the trial court properly admitted Wilhelm's 2011 assault conviction after carefully analyzing its admission under the rules governing admission of ER 404(b) evidence.

---

[15] Hensel's "black out" that she said accounts for her lack of memory presumably occurred on the night of the assault and not at trial.

70704-3-I/23

Harmless Error

The State argues that even if the trial court erred by admitting Wilhelm's prior conviction the error was harmless. We agree.

In analyzing the erroneous admission of evidence in violation of ER 404(b), we apply the nonconstitutional harmless error standard. Gunderson, 181 Wn.2d at 926. This determination involves, "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Gresham, 173 Wn.2d 405, 425, 269 P.3d 207 (2012) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

As summarized above, the evidence of guilt against Wilhelm was overwhelming.[16] The State presented the testimony of Heather Wilmore, Gary Morrison, Officer Huberdeau, Officer Geiszler, Sergeant Johnson, Detective Horn, and Leah Hensel. The jury viewed the store video which corroborated, in part, the testimony of Wilmore and Morrison. The jury also saw photographs of Hensel's forehead injury. The State presented certified copies of Wilhelm's two previously issued domestic violence no-contact orders and his two prior orders for judgment and sentence for the crimes of violation of no-contact order. Each one of these certified copies were signed

---

[16] The to convict jury instruction for the lesser degree crime of fourth degree assault states in part that the State must prove beyond a reasonable doubt, "that the defendant assaulted Leah Hensel." CP at 53. The jury instruction defines an assault as:

> An assault is an intentional touching or striking or cutting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking or cutting is offensive if the touching or striking or cutting would offend an ordinary person who is not unduly sensitive.

CP at 42.

-23-

by Wilhelm. During defense counsel's closing remarks, he conceded that the video shows Wilhelm was in violation of the no-contact order. He argued to the jury, "this video which really doesn't show anything <u>but a picture of Mr. Wilhelm there in violation of the no contact order.</u> But it doesn't prove the assault." RP (July 15, 2013) at 127 (emphasis added). Thus, under the instructions given at trial, the State's theory of the case, and the evidence established at trial, Wilhelm's "intentional touching, striking or cutting" of Hensel by throwing boxes and or cans of food items at her "regardless of any physical injury" constituted fourth degree assault. In other words, regardless of whether her forehead injury was caused by Wilmore or falling, proof of physical injury is not an essential element of fourth degree assault.

Hensel's best friend, Heather Wilmore heard arguing and crying. She witnessed Hensel kneeling on the floor as Wilhelm hurled boxes and cans at Hensel. Wilmore saw the items make contact with Hensel's body and she saw Hensel's injured forehead. Wilmore's hand was also injured from items thrown by Wilhelm. An officer noted her hand injury. She watched as Keitt struggled to restrain Wilhelm.

Store clerk Gary Morrison provided similar testimony. He also heard arguing, screaming, and crashing sounds. He saw Hensel on her knees crying. He saw an "out of control" Wilhelm yelling and calling Hensel names. RP (July 11, 2013). He saw her forehead injury. He watched as Keitt physically intervened to prevent Wilhelm from further harming Hensel. He heard Keitt say to Wilhelm, you "shouldn't hit a girl." RP (July 11, 2013) at 19. He picked up food items from the floor and reshelved them after the fight ended. He saw Wilhelm, Hensel and Keitt talking to the police officers.

The store video shows Keitt and Morrison running over to aisle 13 after hearing Hensel screaming for Wilhelm to "stop." The video also shows Wilhelm fleeing after hearing police have been called to the store.

Officer Huberdeau testified about his contact with Hensel. She refused to tell him what happened with Wilhelm. He saw the forehead injury. She told him two versions of what happened—she got in a fight with Wilmore and she fell down. She never told him she could not remember what happened or that she "blacked out." He saw her broken finger nail and her forehead injury, consistent with a struggle. She gave Officer Huberdeau Wilhelm's identification but refused to turn over his wallet. She admitted improper contact with Wilhelm and wanted to avoid causing trouble for Wilhelm.

Officer Geiszler took photographs of Hensel's forehead injury. She told him she loved Wilhelm and wanted to avoid causing trouble for him when Officer Geiszler said it was not "okay" for Wilhelm to assault her. He offered but she refused domestic violence assistance. Hensel never told him she could not remember what happened due to "black out."

Sergeant Johnson testified about the cut he saw on Wilmore's hand that occurred when she tried to physically prevent harm to Hensel from the items Wilhelm threw at Hensel. Sergeant Johnson said Wilmore told him she saw Wilhelm hitting Hensel on the head with a can of food from the store.

Officers testified about Wilhelm's arrest. He ran from them when they ordered him to stop and show his hands. They chased him and found him hiding stomach down in a heavily vegetated area. He also lied to officers about whether he had contact with Hensel.

-25-

The court also instructed the jury that it could only use Wilhelm's 2011 assault conviction of Hensel for the limited purpose of assessing Hensel's credibility or resolving inconsistencies in her testimony, not as propensity evidence. Jurors are presumed to follow the court's instructions. State v. Ervin, 158 Wn.2d 746, 756, 147 P.3d 567 (2006). Both the State and defense counsel adhered to this instruction in closing remarks. The State elicited no underlying facts about the 2011 assault conviction at trial.

In Gunderson, the court found the admission of two domestic violence convictions materially affected the outcome at trial and reversed. Here, there is overwhelming evidence of Wilhelm's guilt on both charges as summarized and discussed above. By contrast, in Gunderson neither of the two alleged victims[17] testified that an assault occurred. Besides the evidence of Gunderson's two prior convictions, the State presented Bonnie's 911 call and her statement to responding police. The court held that under these circumstances "it is reasonably probable that absent the highly prejudicial evidence of Gunderson's past violence the jury would have reached a different verdict." Gunderson, 181 Wn.2d at 926.

We conclude the error, if any, was harmless given the ample evidence of guilt.

Ineffective Assistance of Counsel

Wilhelm argues that his attorney was ineffective for proposing a limiting instruction that restricted evidence of his prior assault conviction to "assessing the

_____

[17] The mother was also an alleged assault victim. But Gunderson was not charged with assaulting the mother.

credibility of Leah Hensel and <u>explaining the inconsistencies in her testimony.</u>" He claims the underscored portion constitute a judicial comment on the evidence.

A defendant's right to effective assistance of counsel is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. <u>State v. Hendrickson</u>, 129 Wn.2d 61, 77, 917 P.2d 563 (1996) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To succeed on a claim for ineffective assistance of counsel, the defendant must first establish that the trial counsel's performance was deficient. Deficient performance is performance falling below an objective standard of reasonableness based on consideration of all the circumstances. <u>State v. McFarland</u>, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Next, the defendant must show that the deficient performance prejudiced him. Prejudice is shown when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. <u>Hendrickson</u>, 129 Wn.2d at 77-78. The inquiry ends if the defendant fails to establish either prong. <u>Hendrickson</u>, 129 Wn.2d at 78.

<u>Deficient Performance</u>

The trial court gave the jury a limiting instruction proposed by Wilhelm limiting the jury's consideration of Wilhelm's prior assault conviction. He claims the underscored phrase below is a judicial comment that tells the jury that Hensel's testimony was inconsistent.[18]

---

[18] Arguably the inclusion of the phrase was a tactical decision. As discussed above, defense counsel argued that Hensel's testimony was inconsistent and she is not credible.

-27-

Certain evidence has been admitted in this case for only a limited purpose. This evidence consist[s] of a prior assault conviction of Mr. Wilhelm and may be considered by you only for the purpose of assessing the credibility of Leah Hensel and explaining the inconsistencies in her testimony. You may not consider it for any other purpose. You may not consider it to determine if an assault occurred in this case. Any discussion of the evidence during your deliberations must be consistent with this limitation.

CP at 19 (emphasis added).

We review whether a jury instruction constitutes a judicial comment on the evidence de novo and in the context of the instructions as a whole. State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Article IV, section 16 of the Washington Constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." This provision prohibits a judge from conveying to the jury his or her personal attitudes toward the merits of the case or instructing the jury that matters of fact have been established as a matter of law. State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997). An appellate court will "review the instructions in the same manner as a reasonable juror." State v. Hanna, 123 Wn.2d 704, 719, 871 P.2d 135 (1994).

The State contends that the instruction conveys no judicial opinion on Hensel's credibility because, viewed as a whole and in the context of other instructions, the court's instructions left to the jury to decide the credibility of Hensel's testimony.

Quoted above, the limiting instruction correctly informed the jury that the assault conviction may be considered only to assess Hensel's credibility. Jury instruction 1 also informed the jury that a trial judge is constitutionally prohibited "from making a comment on the evidence" or "to express by words or conduct, my personal opinion about the

value of testimony or other evidence." CP at 34. That instruction further instructed the jury to entirely disregard what may appear to constitute an expression of the court's personal opinion about the value of the testimony or evidence during the trial or in giving the instructions. Finally, jury instruction 1 informed the jury of its duty as the sole judges of the credibility of witnesses:

> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testified about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

CP at 33-34.

Wilhelm cites to several cases involving instructions that misstate the elements of the crime in the to convict instruction or misrepresented the burden of proof. None of those cases control here. They are factually dissimilar to the present case.[19]

The challenged phrase in the limiting instruction does not constitute a judicial comment on the evidence. Wilhelm thus fails to establish his attorney's deficient performance in proposing the language of the limiting instruction.

---

[19] See State v. Kyllo, 166 Wn.2d 856, 871, 215 P.3d 177 (2009) (instruction misstated the level of harm required for self-defense); In re Pers. Restraint of Wilson, 169 Wn. App. 379, 279 P.3d 990 (2012) (instruction misstated the requirements for accomplice liability); Becker, 132 Wn.2d at 65 (instruction defined building as a school relieved the State of its burden to prove all the elements of the sentence enhancement statute).

Prejudice

Wilhelm claims he was prejudiced by the instruction. He argues "if Hensel's testimony was inconsistent that meant she was not credible. If she was not credible, then the jury would infer that she was dishonest about her memory and that she was covering for Wilhelm. The court's comment in the instruction was thus damning evidence that Wilhelm was guilty of assaulting Hensel." Appellant's Br. at 25.

Even if we assume deficient performance, Wilhelm's prejudice argument ignores the overwhelming evidence summarized above of Wilhelm's guilt. To establish prejudice, Wilhelm must demonstrate a reasonable probability that but for counsel's errors, the result of the trial would have been different. Hendrickson, 129 Wn.2d at 78. A mere showing that an error by counsel had some conceivable effect on the outcome is insufficient. Strickland, 466 U.S. at 693. Wilhelm relies on the rule that a judicial comment in a jury instruction is presumed prejudicial. State v. Levy, 156 Wn.2d 709, 725, 132 P.3d 1076 (2006). He is not entitled to the benefit of this presumption because "the State shows that the defendant was not prejudiced or the record affirmatively shows that no prejudice could have resulted." State v. Hartzell, 156 Wn. App. 918, 937, 237 P.3d 928 (2010). Hensel gave varying accounts of what happened—she fell, her best friend Wilmore caused her head injury, and memory loss.

Overwhelming evidence summarized above establishes that Hensel's testimony was indeed inconsistent. No reasonable jury could have determined otherwise given the evidence presented by the State. Even defense counsel attacked Hensel's credibility by pointing out her inconsistencies in closing argument. For example, he argued, "they don't even believe anything that's coming out of [Hensel's] mouth." RP

(July 15, 2013) at 122. He continued, "[W]e all know that Ms. Hensel is somewhat not a credible witness. . . . [Y]ou can use that assault to assess her credibility. . . . <u>She's not a very credible witness.</u>" RP (July 15, 2013) at 131 (emphasis added).

Finally, as noted above, jury instruction 1 correctly informed the jury of its duty as the "sole judges" of credibility and to ignore any words or actions that may be viewed as a personal opinion by the court on the testimony or other evidence. The jury is presumed to follow these instructions. <u>Ervin</u>, 158 Wn.2d at 756.

Accordingly, we are not persuaded that the challenged phrase in the limiting instruction resulted in any prejudice to Wilhelm. His ineffective assistance claim fails.[20]

<u>Bifurcation</u>

Wilhelm argues the trial court abused its discretion when it denied his motion to bifurcate the trial and require the State to prove his prior convictions in a separate proceeding. He claims a bifurcated proceeding ensures against the jury's use of the conviction as propensity evidence. He asserts the trial court's ruling shows the court's "misunderstanding of the law and a failure to exercise discretion." Appellant's Br. at 26-27.

---

[20] In <u>State v. Brush</u>, No. 90479-1 slip op. at 1 (Wash. July 2, 2015) our Supreme Court held that the jury instruction defining "prolonged period of time" constitutes an improper comment because it essentially told the jury that abuse occurring for more than two weeks met this definition. The court analogized this instruction to the instruction in <u>State v. Levy</u>, 156 Wn.2d 709, 721-22, 132 P.3d 1076 (2006) where the instruction there referred to a crowbar as an example of a deadly weapon. In <u>Brush</u>, the court also held the improper comment was prejudicial because the State failed to rebut the presumption of prejudice by showing no prejudice could have resulted. The court affirmed reversal of Brush's exceptional sentence.

For the reasons discussed above, <u>Brush</u> does not apply here.

The court explained its rationale:

[T]he case law is against that position at this point in time, so I will not bifurcate. I think the state is allowed to admit the priors in its case-in-chief because they are an alleged element of the crime. I will consider a limiting instruction if the defense proposes one.

RP (July 9, 2013) at 49.

A trial court's decision on bifurcation is generally reviewed for an abuse of discretion. State v. Roswell, 165 Wn.2d 186, 192, 196 P.3d 705 (2008). A court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds. Where a prior conviction raises the base crime to a felony, the existence of those prior convictions is an element of the crime and not an aggravator. Thus, a defendant has no right to bifurcate the proceedings and waive jury trial on the element of the priors alone. Roswell, 165 Wn.2d at 197 (holding that the defendant had no right to keep his prior convictions for violation of a court order from the jury by presenting that evidence at a separate bench trial). Felony violation of a no-contact order requires proving at least two prior violations of no-contact orders. The prior violations are therefore elements of the crime of felony violation of a no-contact order.

Roswell controls. The trial court here properly denied the bifurcation motion. "Courts have long held that when a prior conviction is an element of the crime charged, it is not error to allow the jury to hear evidence on that issue." Roswell, 165 Wn.2d at 197 (citing Pettus v. Cranor, 41 Wn.2d 567, 568, 250 P.2d 542 (1952)).

Prosecutorial Misconduct in Closing

Wilhelm claims the prosecutor's rebuttal closing argument about the lack of evidence that the no-contact orders had been revoked improperly shifted the burden of proof.

> [The State]: He had a no contact order—two no contact orders. Now, you're going to be able to see those back in the jury room, but these have been proven beyond a reasonable doubt because they're certified true and correct copies of those actual two no contact orders. You'll also get the certified copies of the Department of Licensing photos of both Leah Hensel and Damian Wilhelm backing up their identities. Obviously you saw them here in court. They acknowledged who they were. But that's just an extra evidence to show you who this order is talking about. And you've heard Detective Horn's testimony that those orders were in place at the time of this violation on March 11, 2013. The orders you can see themselves were signed in 2012. They don't expire until 2014. They were in existence.
>
> Now, the next element that we have to prove is that he knew they existed. Of course he knew that they existed. He knew that they existed because he signed each of them in open court. And you'll be able to see it once you get back in[to the] jury room. It says, "Done in open court in the presence of the defendant" and he signs it. <u>There is no evidence that you've heard in this trial that anyone ever tried to change or lift those orders.</u> The information says that they don't expire until next year. [21]
>
> [Defense Attorney]: I'm going to object to that, Your Honor. That's shifting the burden.
>
> THE COURT: Overruled.

RP (July 15, 2013) at 110-11 (emphasis added).

To prevail on a claim of prosecutorial misconduct, a defendant is required to show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial. <u>State v. Thorgerson</u>, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To establish prejudice the defendant must prove that there is a substantial likelihood the instances of misconduct affected the jury's

---

[21] Wilhelm quotes only the final two sentences.

verdict. Thorgerson, 172 Wn.2d at 442-43. It is not misconduct for a prosecutor to argue that the evidence does not support the defense theory. State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997). A prosecutor is entitled to make a fair response to the arguments of defense counsel. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

At trial, defense counsel elicited testimony from the detective about the validity of the orders and Wilhelm's knowledge.

> [Defense Counsel]: Okay. So—so it is, I won't say often, but sometimes victims come into court and ask for the no contact order to be recalled.
> [Witness]: That is correct.
> [Defense Counsel]: And sometimes those recall orders take some time to get into the computer system so it shows up on an officer's computer; is that correct?
> [Witness]: That is correct, but we have to go off of what we have at that moment.
> [Defense Counsel]: Yeah. Fair enough.
> So it is possible then that Mr. Wilhelm—I mean, let me just back up. You couldn't confirm as part of this investigation if [Wilhelm] knew it was still active and in place because sometimes these orders get recalled. Fair enough?
> [Witness]: I'm sorry. I can't speak to his mental state if he knew the order was valid or not.

RP (July 15, 2013) at 61-62.

In closing, defense counsel argued the State had failed to prove that Wilhelm knew about the issuance of valid no-contact orders.

> The thing the state need[s] to really prove, and I don't think they proved beyond a reasonable doubt, is that Mr. Wilhelm knew that the violation of the no contact order was in place. That's hard to prove someone's mindset without strong compelling evidence.

RP (July 15, 2013) at 134.

-34-

The record leaves no doubt that it was defense counsel who first raised the issue of the no-contact orders' validity and Wilhelm's knowledge both at trial and in closing remarks. Under these circumstances, the State properly pointed out to the jury in rebuttal the absence of any evidence to support Wilhelm's claim he lacked knowledge about the no-contact orders. The prosecutor's challenged rebuttal remarks constitute neither misconduct nor prejudice. Further, jury instruction 2 properly informed the jury that the State "has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements." CP at 36. The jury is presumed to follow the court's instructions. Ervin, 158 Wn.2d at 756.

## CONCLUSION

For the reasons discussed above, we affirm Wilhelm's judgment and sentence.

WE CONCUR:

Cox, J.

-35-